489 So.2d 998 (1986)
STATE of Louisiana
v.
Robert L. WHITAKER, Jr.
No. KA 85-1274.
Court of Appeal of Louisiana, First Circuit.
May 28, 1986.
*999 Bryan Bush, Dist. Atty., Baton Rouge, by Ernest Smithling, Asst. Dist. Atty., for plaintiff-appellee.
Brady Jones, APD, Public Defenders' Office, Baton Rouge, for defendant-appellant.
Before GROVER L. COVINGTON, C.J., and LOTTINGER and CRAIN, JJ.
CRAIN, Judge.
Robert Whitaker was charged by indictment with the second degree murder of Joseph Douglas. He pled not guilty, elected trial by jury, and was found guilty as charged. He received the mandatory sentence of life imprisonment at hard labor *1000 without benefit of parole, probation, or suspension of sentence. The defendant has appealed, alleging nine assignments of error.
Assignments of error numbers 1, 2, 6, and 9 were not briefed on appeal and are, therefore, considered abandoned. Uniform RulesCourts of Appeal, Rule 2-12.4.

FACTS
Late in the evening on February 5, 1984, Jack Douglas, not having heard from his brother, Joseph for a week, grew concerned. He drove to the victim's home at 3844 Brady Street in Baton Rouge, knocked on the door, but received no answer. After determining that he could not find a way into the house, he contacted the Baton Rouge Police Department and asked for assistance. Before the police came, the victim's son, Warren Douglas, arrived. When the police arrived, Warren kicked in the back door and the police officers entered the house. The officers found the nude and lifeless body of Joseph Douglas lying in a pool of dried blood. Examination of the body revealed that the victim had been shot in the right leg, hit on the head with a blunt instrument, and cut several times on the back and the neck. It was later determined that the victim was killed by the blow to the head and that he had been dead for at least two days before his body was discovered.
The crime scene investigation revealed that there was a great deal of blood on the walls and the floor near the victim's body. The victim's blood was discovered in several rooms in the house. A blood-covered table leg, which had been removed from the dinner table, was lying near the victim's body. Investigators also discovered a bloody knife, which was set in a knife rack in the kitchen. They recovered a bullet slug which had lodged in the sofa bed in one of the bedrooms. A bloodstained electrical cord, which had been removed from a typewriter in the study, was also discovered. A knot in the cord suggested that at one point the victim may have been bound. An extension cord was also found lying in the hallway. The victim's car, wallet, and checkbook were determined to be missing.
The investigators were able to successfully lift fingerprints from several objects in the house. Some of these fingerprints belonged to the defendant. Footprints in the dried blood also belonged to the defendant. When the victim's car was recovered, the defendant's fingerprints were lifted from the gas cap and from several objects inside the car.
A few days after the victim's body was discovered, an executive with City National Bank phoned the police concerning two checks that had been drawn on the victim's account and several credit card charges that had been made immediately before or after the time of the victim's death. Both of the checks, (one for $700 and one for $1,650) were endorsed by the defendant. Two bank employees picked the defendant's picture out of a photographic lineup. They positively identified the defendant as being the same person who had cashed the checks. When the defendant cashed the second check on February 6, one day after the victim's body had been discovered, he gave the bank supervisor a telephone number which he claimed was that of Joseph Douglas. When she called that number, she received verification from an individual claiming to be Joseph Douglas. The defendant was arrested on February 14, 1984, in Buena Park, California. At the time of his arrest, the defendant denied knowing the victim and claimed that he had been in California for six weeks.
At the trial, the defendant attempted to explain the presence of his fingerprints in the victim's home and car. The defendant testified that he was invited to the victim's home on January 25, 1984. After several drinks, the two men engaged in homosexual relations, after which, according to the defendant, the victim wrote the defendant two checks for a loan which totaled $2,350. The defendant also testified that he was invited back two days later to discuss the value of the victim's car. The victim asked the defendant to appraise the car's value since the defendant sold used cars. The *1001 two men went for a test drive in the car, then returned to the victim's home and the defendant left.

ASSIGNMENTS OF ERROR NUMBERS 3, 4, 5, AND 8:
In these assignments of error, the defendant argues that the trial court erred in allowing a statement which the defendant made to Buena Park police officers to be admitted into evidence. First, the defendant argues that the statement was not free and voluntary. Second, he argues that the trial court erred in allowing the statement into evidence, since the state had failed to give notice of its intent to use the statement according to La.C.Cr.P. art. 768.
The defendant argues that his statement was not freely and voluntarily given. It is well settled that for a confession or inculpatory statement to be admissible into evidence, the state must affirmatively show that it was freely and voluntarily given without influence of fear, duress, intimidation, menace, or promises. La.R.S. 15:451; State v. Brooks, 434 So.2d 1171 (La.App. 1st Cir.1983), writ denied, 440 So.2d 727 (La.1983). The trial court's determination that the state has met its burden of proof with regard to voluntariness is entitled to great weight. State v. Hernandez, 432 So.2d 350 (La.App. 1st Cir.1983). Furthermore, the determination of a witness' credibility on this issue, being a function of the trier of fact, is entitled to great weight. Hernandez, 432 So.2d 350.
The defendant does not deny that he received his Miranda rights. His entire argument on this point consists of the fact that he did not sign a waiver of rights form. However, failure to obtain the accused's signature to a written Miranda waiver does not mandate a determination of involuntariness in deciding whether a confession or inculpatory statement is admissible in evidence. State v. Turnbull, 377 So.2d 72 (La.1979). It is not required that the police have either a signed waiver of rights form or another officer to substantiate that such rights were given to the defendant. The state need only prove that the defendant was given the Miranda rights. State v. Odds, 448 So.2d 868 (La. App. 1st Cir.1984), writ denied, 477 So.2d 701 (La.1985).
Officer Hayes of the Buena Park Police Department testified that the defendant was informed of his rights, that he understood those rights, and that he was willing to talk to the police officers. His testimony was not contradicted or denied by the defendant. Therefore, we find that the state met its burden of proving the voluntariness of the defendant's statement.
The defendant also objected to the introduction of his statement without the notice required by La.C.Cr.P. art. 768, which provides:
Unless the defendant has been granted pretrial discovery, if the state intends to introduce a confession or inculpatory statement in evidence, it shall so advise the defendant in writing prior to beginning the state's opening statement. If it fails to do so a confession or inculpatory statement shall not be admissible in evidence.
The trial court concluded that the defendant was not entitled to article 768 notice because the defendant had been granted pretrial discovery. The trial court also concluded that article 768 was not applicable because the statement was exculpatory, instead of inculpatory. We agree.
Although the state incorrectly answered one of the discovery questions by replying that it did not intend to introduce any statements into evidence at the trial, the state did acknowledge that the defendant had made a statement in response to interrogation by a police officer in which he denied any involvement in the crime. Since the defendant had been granted pretrial discovery, and the state had informed the defendant of the substance of the statement which the defendant made to the arresting officers, La.C.Cr.P. art. 768 was not applicable.
Furthermore, in State v. Curry, 325 So.2d 598 (La.1976), the Louisiana Supreme Court held that the state is not *1002 required to give article 768 notice in order to introduce into evidence a statement which is exculpatory. The defendant's argument assumes that the statement, in and of itself, was inculpatory. Such is not the case. As contemplated by article 768, an "inculpatory statement" refers to an out of court admission of incriminating facts made by the defendant after the crime has been committed. An incriminating statement is one which admits a fact tending to establish guilt, or from which guilt may be inferred. State v. Bodley, 394 So.2d 584 (La.1981). Applying these definitions to the defendant's statement, it is clear that the statement was not "inculpatory" for purposes of article 768. See State v. Seymour, 449 So.2d 1189 (La.App.2d Cir.), writ denied, 452 So.2d 173 (La.1984). Therefore, we hold that article 768 notice was not required in this instance.
The defendant also maintains that he was prejudiced by the surprise testimony in regard to these statements, as a result of the state's failure to give notice of them pursuant to La.C.Cr.P. art. 716.
As defense counsel points out in brief, some time prior to the trial date, he presented the State with the following interrogatories:
Did the defendant make any oral confession or statement of any nature which the District Attorney intends to offer in evidence? If so, please state when, where and to whom such oral confession or statement was made.

.....
Did the defendant make any oral statement, whether before or after arrest, in response to interrogation by any person then known to the defendant to be a law enforcement officer? If so, please state the substance of said statement(s).
The State responded to the first of the above questions by answering, "No," and to the second by stating, "Yes, the defendant denied any involvement in the crime." Following his receipt of these answers from the State, defense counsel made no motion for supplemental discovery or for a hearing before the trial judge at which the sufficiency of the State's answers could be evaluated.[1]
At trial the State elicited testimony from the California police officer that had arrested the defendant. This officer testified that in his statement the defendant denied knowing the victim, and claimed that he had travelled to California by bus some six weeks before the incident. He also stated that he had earned the approximately $600 in cash found on him through working on a barge and as a used car salesman. The trial court overruled defense counsel's objections to this testimony.
Defendant was entitled to know if the State intended to offer the statement in evidence. La.C.Cr.P. art. 716(C) provides:
Upon motion of the defendant, the court shall order the district attorney to inform the defendant of the substance of any oral statement which the state intends to offer in evidence made by the defendant, whether before or after arrest, in response to interrogation by any person then known to the defendant to be a law enforcement officer.
But, it was within the trial court's discretion to disallow the statement in accordance with the discovery sanctions provided for in La.C.Cr.P. 729.5[2]. Accordingly, a showing of prejudice by virtue of the trial court's adverse ruling must be made before a reversal of the conviction would be in order. State v. Norwood, 396 So.2d 1307 *1003 (La.1981), State v. Freeman, 447 So.2d 1145 (La.App. 3rd Cir.1984), writ denied 449 So.2d 1356 (La.1984).
In brief to this court, defense counsel alleges prejudice as a result of the "surprise" testimony. However, this is a conclusionary allegation. Counsel gives no reasoning in support of his allegations nor points to anything in the record to support one. In fact, the record indicates otherwise.
During his objection and before the contents of the statement were disclosed, defense counsel made the following remarks:
I thought there was asome statement about time frame being in California and so forth. That's what I thought thatthat he was going to testify to * *
I'm saying I was under the impression... that this officer or the other officers were going to testify in regards to time frames that Mr. Whitaker was in California....
Apparently defense counsel did have some foreknowledge in regard to defendant's statement and what the police officer's testimony was designed to elicit.
Moreover, there is simply no showing of prejudice by the defendant. Defense counsel gives us no indication of how he might or could have altered his defense strategy had the State properly complied with discovery. Other than thoroughly cross-examining the State's witness as to the voluntariness of defendant's statement, which he did, defense counsel does not allege that there was any evidence or testimony he might have introduced to undermine the effect of the statements.
After the trial the defendant filed a motion for new trial based upon the same objections to the statement as those argued above. Since we have decided that those arguments are without merit, we also hold that the defendant's motion for new trial was correctly denied by the trial court.
These assignments of error are without merit.

ASSIGNMENT OF ERROR NUMBER 7:
In this assignment of error, the defendant argues that the trial court erred in denying his motion for post-verdict judgment of acquittal. This argument is based on the defendant's contention that the evidence was insufficient to either (1) identify him as the person who murdered the victim or (2) prove that he had the specific intent to commit second degree murder.
In State v. Nealy, 450 So.2d 634, 636-37 (La.1984), the Louisiana Supreme Court made the following comments concerning the standard of review for the sufficiency of evidence to be employed by appellate courts:
The constitutional standard of review for the sufficiency of evidence to support a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The statutory rule as to circumstantial evidence is that assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. La.R.S. 15:438. This statutory rule is not a purely separate test from the Jackson standard to be applied instead of a sufficiency of the evidence test whenever the state relies on circumstantial evidence to prove an element of the crime. State v. Wright, 445 So.2d 1198 (La.1984). Ultimately, the Jackson standard is the objective standard for testing the overall evidence, direct and circumstantial, for reasonable doubt. State v. Wright, supra; State v. Sutton, 436 So.2d 471 (La.1983). The statutory rule provides an evidentiary guideline for the jury when considering circumstantial evidence and facilitates appellate review of whether a rational juror could have found the defendant guilty beyond a reasonable doubt. Exclusion of every reasonable hypothesis of innocence is therefore a component of *1004 the more comprehensive reasonable doubt standard, where circumstantial evidence is used to convict. Thus, although the circumstantial evidence rule (La.R.S. 15:438) may not establish a stricter standard of review than the more general reasonable juror's reasonable doubt formula, it emphasizes the need for careful observance of the usual standard and provides a helpful methodology for its implementation in cases which hinge on the evaluation of circumstantial evidence. State v. Wright, supra; State v. Sutton, supra; State v. Chism, 436 So.2d 464 (La.1983).
La.R.S. 14:30.1 provides:
Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, aggravated arson, aggravated burglary, aggravated kidnapping, aggravated escape, armed robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.

.....
Specific criminal intent is that state of mind which exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La.R.S. 14:10(1). The state must show specific intent on the part of the defendant. Although intent is a fact question it need not be proven as a fact. Instead, it may be inferred from the circumstances of the transaction. La.R.S. 15:445; State v. Boyer, 406 So.2d 143 (La.1981).
Considering the above we have no difficulty in affirming a conclusion that the defendant, by cutting the victim on the back and neck with a kitchen knife, shooting the victim, and striking him on the head with a wooden table leg, actively desired the criminal consequences to follow his actions. From the number and type of wounds inflicted upon the victim, the length of time required to inflict them, the smeared blood stains which tended to prove that the victim crawled from room to room during the struggle, strongly imply that the perpetrator persistently and over a significant period of time attempted to seriously injure the victim. When viewing this evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found beyond a reasonable doubt that the defendant had the requisite specific intent to kill the victim or inflict great bodily harm upon him. The defendant's contention in this regard is without merit. See State v. Kirkpatrick, 443 So.2d 546, 553 (La.1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 847 (1984); State v. Bell, 442 So.2d 715, 718 (La.App. 1st Cir.1983), writ denied, 444 So.2d 1244 (La.1984).
The defendant also argues that his identity was not sufficiently proved. In his brief, he states, "Not one of these [state] witnesses could physically place Robert Whitaker at the crime scene." This statement is totally incorrect. The defendant's fingerprints were located on several objects inside the victim's home, including a whiskey bottle. Sybil Guidry, the state's fingerprint expert, positively identified the defendant's right thumbprint on this bottle.
Other evidence links the defendant with this crime. The defendant was positively identified by two City National Bank employees as being the same person who cashed two checks made out to defendant and drawn on the victim's account. When cashing the second check, a counter check, he provided the bank supervisor with a phone number which supposedly belonged to the victim. When the supervisor called this number, she received verification for the check from a person claiming to be Joseph Douglas, when in fact, he had been dead for at least two days. Several charges were also made on various credit cards belonging to the victim after his death. Furthermore, the victim's brother, James Douglas, stated that he saw the defendant driving the victim's car several *1005 days before the body was found. James Douglas testified that it would have been very unusual for the victim to loan his car to anyone. When the victim's body was found the car was not present. It was later found abandoned in a parking lot. The defendant's fingerprints were found on several cans and bottles inside the car and on the locking gas cap.
Furthermore, the defendant does not deny that he was inside the victim's home. He stated that the victim invited him to the house on January 25, 1984. According to the defendant, after talking and drinking for a while, the two men had anal sexual intercourse. The victim then made out two checks totaling $2,350 to the defendant as a loan. The defendant testified that he needed money to deposit in his employer's bank account because he had spent the money he was supposed to deposit.
Nor does the defendant deny that he was inside the victim's car. He testified that on January 27, two days after he had had homosexual relations with the victim in exchange for the loan, he went to the victim's home to give an estimate on the value of the victim's car. The defendant testified that the victim had asked him to look at the car since the defendant was employed as a car salesman and knew the value of used cars. The defendant testified that they took a ride in the car and that the defendant put some gas in the car.
The defendant's version of these incidents might explain the fingerprint on the gas cap and the fingerprints on items inside the car. The fact that he visited the victim's home might, in part, explain the presence of his fingerprints on objects inside the home. He attempts to explain the two checks as being a loan made in exchange for homosexual relations with the victim. However, the defendant cannot explain the most convincing pieces of evidence which positively link him with this crime. The defendant's footprints were found in the dried blood inside the house. Sybil Guidry, the state's expert, identified several bloody footprints (both right and left feet) as being those of the defendant.
It is clear from these prints that the defendant walked bare foot through the victim's blood while it was still wet. When the blood dried several clear impressions remained to incriminate the defendant. When asked to explain the presence of his bloody footprints on cross-examination, the defendant replied: "It's something I can't explain, sir. Iuhit's a mystery to me."
Although the evidence against the defendant is circumstantial, it is considerable. The fact that his bloody footprints were found on the floor of the victim's house combines with the other evidence to exclude every reasonable hypothesis of innocence. When all of the evidence is viewed in a light most favorable to the prosecution, a rational trier of fact could have concluded beyond a reasonable doubt that the defendant committed the second degree murder of Joseph Douglas. Therefore, the trial court did not err in denying the defendant's motion for post-verdict judgment of acquittal. This assignment of error is meritless.
The conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] In brief, defense counsel acknowledges that the State's error was made unwittingly and in good faith.
[2] La.C.Cr.P. art. 729.5(A) provides:

A. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this Chapter or with an order issued pursuant to this Chapter, the court may order such party to permit the discovery or inspection, grant a continuance, order a mistrial on motion of the defendant, prohibit the party from introducing into evidence the subject matter not disclosed, or enter such other order, other than dismissal, as may be appropriate.