823 So.2d 1072 (2002)
STATE of Louisiana, Plaintiff-Appellee
v.
Corey A. WILLIS, Defendant-Appellant.
No. 36,198-KA.
Court of Appeal of Louisiana, Second Circuit.
August 14, 2002.
*1075 Peggy J. Sullivan, Monroe, for Defendant-Appellant.
Richard Ieyoub, Attorney General, Walter E. May, Jr., District Attorney, Daniel W. Newell, Assistant District Attorney, for Plaintiff-Appellee.
*1076 Before NORRIS, STEWART and KOSTELKA, JJ.
NORRIS, Chief Judge.
The defendant, Corey Willis, was charged by bill of information with two counts of attempted second degree murder arising from the shootings of brothers Thomas Ridley and Wallace Ridley. A 12-member jury returned responsive verdicts of attempted manslaughter of Thomas Ridley and aggravated battery of Wallace Ridley. The District Court imposed consecutive hard-labor sentences of 15 and seven years for the respective convictions. Willis appealed, urging five assignments of error; however, this court summarily vacated the sentences because the District Court had never ruled on Willis's timely motion for new trial. State v. Willis, 34,963 (La.App. 2 Cir. 3/29/01). On remand, the District Court denied the motion for new trial and, at the same hearing, reimposed the consecutive hard-labor sentences of 15 and seven years. Represented by new appellate counsel, Willis now appeals urging six supplemental assignments of error. Finding no reversible error, we affirm.

Factual background
Shortly before 2:00 a.m. on January 18, 1998, several shots were fired on the highway in front of Club Adrian, a lounge in rural Claiborne Parish near Homer. The first victim, Thomas Ridley, sustained a shotgun blast to the front of his lower left leg; the emergency room physician who treated him testified that the shot left a "large bone deficit," cut an exit wound, and very nearly severed an artery. Thomas testified that he spent 17 days in the hospital and now has no feeling in his leg. Thomas positively identified Willis as the man who shot him. Thomas also testified that after firing a few more shots (including one that struck Wallace Ridley), Willis returned to him, pointed the sawed-off shotgun in his face, pumped and pulled the trigger. However, the gun was out of ammunition, so Willis fled.
The second victim, Wallace Ridley, was shot in the side of his lower right leg. The emergency room physician recovered a shotgun wad from Wallace's wound, leading him to think the shot had been at close range. Wallace spent 5½ months in the hospital and eventually lost his leg. Wallace testified that he did not know who shot him, and did not even see anyone with a gun. However, he recalled that he was fighting with Willis's brother, Starsky, when the shooting occurred. He also recalled that earlier in the evening, he had been in a fight with another bar patron, Kelvin Walker (referred to as "Slim"); after he was shot, Starsky and Slim kicked him and pulled him into a ditch.
All witnesses agreed that the club and parking area were extremely crowded that morning. Thomas testified that some 15 or 20 minutes before the shooting, Wallace and Slim got into a fight outside the entrance to the club. Thomas understood that this fight was over a woman; however, the victims' sister, Cynthia Ridley, testified that it was a fight about money. Thomas made his way from inside the bar to outside, where the commotion was, but by the time he got there the scuffle had ended. He testified that he told his brother, "Let's go," and they started walking toward the highway, where Wallace's car was parked. Along the way Thomas spoke to several people, including Deputy Randy Pugh, who happened to be driving by the lounge. (Deputy Pugh testified that he was called to the scene because of a parking problem but did not recall speaking to Thomas before the shooting.) According to Thomas, when they reached Wallace's car, Wallace remembered that he had left his keys with somebody else. *1077 While they waited for that person to bring the keys, Thomas stepped to the side and started to light a cigarette when suddenly he heard gunfire. The first shot whizzed by his back; he turned and saw Willis holding a sawed-off shotgun and told him, "Help me break this up." However, Willis shot him in the leg and then shot Wallace. He then aimed the gun at Thomas's head but it did not fire.
Cynthia Ridley, the victims' sister, testified that she was at Club Adrian that morning and corroborated much of Thomas's testimony. She added, however, that after the initial scuffle, when Thomas and Wallace started walking toward the highway, several people followed them, including Slim, Starsky, and Willis, who was carrying a gun. She testified that she saw Willis fire once into the air; then he shot Thomas in the leg, and then he shot Wallace. She also testified that she had run behind her brothers to warn them that somebody was coming with a gun; however, neither Thomas nor Wallace remembered seeing her there.
Another bar patron, Kathryn Jackson, testified that she had just left Club Adrian and was driving down the road when she saw Willis shoot Wallace with a sawed-off shotgun. She noted that Willis had no shirt on. Officer Clem Willis, a Haynesville policeman not related to the defendant, testified that he was at Club Adrian that morning and heard four gunshots. There were people running everywhere, but he saw Willis and his brother, Starsky, running out of a wooded area across the highway. Willis had taken his shirt off and was passing a sawed-off shotgun to Starsky, as though it were hot. All witnesses agreed the lighting at the scene of the shootings was ample because of street lamps at a nearby power station.
Deputy Chuck Talley, of the Claiborne Sheriffs Office, testified that he recovered three 12-ga. shotguns hulls from the scene. At the hospital he recovered cotton wadding from Wallace's leg wound. He also questioned Thomas at the hospital and, later, Cynthia Ridley. The shotgun itself was never recovered. Willis was arrested on January 21, 1998.

Discussion: Sufficiency of evidence
By his first two supplemental assignments of error, Willis urges the evidence is insufficient to support the conviction for attempted manslaughter in that the state did not prove, beyond a reasonable doubt, a specific intent to kill. He contends that the only evidence to support this essential element of the crime is Thomas's own testimony that after shooting him in the leg, Willis aimed the shotgun at his (Thomas's) head and pulled the trigger. Willis urges this court to reject Thomas's testimony as "confusing, inconsistent and unbelievable." He concludes that this was a "fight that ended badly," and submits that the record will support nothing more than a conviction of aggravated battery.
The proper vehicle for raising a claim of insufficient evidence is a motion for post verdict judgment of acquittal. La. C.C.P. art. 821. The record does not show that Willis filed such a motion, but this court reviews sufficiency when it is raised only by assignment of error. State v. Green, 28,994 (La.App. 2 Cir. 2/26/97), 691 So.2d 1273.
When issues are raised on appeal both as to sufficiency of the evidence and one or more trial errors, the reviewing court first determines the sufficiency. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App. 2 Cir. 4/2/97), 691 So.2d 347, writ denied 97-1203 (La.10/17/97), 701 So.2d 1333. This is because if the evidence is determined to be constitutionally insufficient, the defendant is entitled to an acquittal. State v. Hudson, *1078 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981).
The constitutional standard of appellate review for sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).
The Jackson standard is applicable to cases involving both direct and circumstantial evidence. On review, the facts established by the direct evidence and inferred from the circumstantial evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La.App. 2 Cir. 9/25/98), 719 So.2d 610, writ denied 98-2723 (La.2/5/99), 737 So.2d 747.
This court's authority to review questions of fact in a criminal case is limited to the sufficiency standard enunciated in Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2 Cir.1984). A reviewing court accords great deference to the jury which may accept or reject, in whole or in part, the testimony of any witnesses. State v. Silman, 95-0154 (La.11/27/95), 663 So.2d 27; State v. Bosley, supra. Positive identification by one witness may be sufficient to support the conviction. State v. Neal, 00-0674 (La.6/29/01), 796 So.2d 649; State v. Davis, 27,961 (La.App. 2 Cir. 4/8/96), 672 So.2d 428, writ denied 97-0383 (La.10/31/97), 703 So.2d 12.
Manslaughter, as it pertains to this case, is a homicide which would be murder but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. La. R.S. 14:31. Attempted manslaughter requires proof of specific intent to kill. La. R.S. 14:27; State v. Hutcherson, 34,540 (La.App. 2 Cir. 4/4/01), 785 So.2d 140; State v. Brunet, 95-0340 (La.App. 1 Cir. 4/30/96), 674 So.2d 344, writ denied 96-1406 (La.11/1/96), 681 So.2d 1258.
Specific intent need not be proven as a fact, but may be inferred from the defendant's actions and the circumstances of the transaction. State v. Broaden, 99-2124 (La.2/21/01), 780 So.2d 349; State v. Baker, 34,973 (La.App. 2 Cir. 9/26/01), 796 So.2d 145. The specific intent to kill may be inferred when the defendant aims a gun directly at his victim and fires. State v. Owens, 606 So.2d 876 (La.App. 2 Cir.1992).
As noted, Thomas testified that when he heard the first shot, he felt the blast of a shotgun across his back; when he turned around, Willis shot him in the leg; after Willis shot Wallace, he returned to Thomas, pointed the gun directly at his face and attempted to fire. Thomas's sister, Cynthia, also positively identified Willis as the shooter; all witnesses agreed there was sufficient lighting to make an identification. This evidence, if accepted by the trier of fact, is sufficient to prove beyond a reasonable doubt that Willis committed the attempted manslaughter of Thomas.
Willis correctly contends that at times Thomas's testimony was "confused and meandering"; the District Court even remarked that it was hard to follow, and instructed Thomas to answer only the questions asked. However, much of the "confusion" arose when Thomas was asked *1079 to retrace, in minute detail, the path he took from the door of Club Adrian to the street and back to where the shooting occurred and to name the people he saw along the way. Like other witnesses, he referred to certain persons at the scene by an array of nicknames and digressed about some who may not have been involved in the incident. Although his sister corroborated much of his testimony, Thomas did not recall that she was even there. Thomas stated that before the shooting, he spoke to Dep. Pugh, but Dep. Pugh did not recall speaking to him. The witnesses offered varying estimates of how many shots were fired, and whether one or more sounded as if it may have come from a handgun.
The jury obviously disregarded these inconsistencies, which may be expected from witnesses describing the end of a late night of drinking, partying and occasional scuffling. The testimony supports the conclusion that because of an earlier fight, Willis retaliated by fetching a sawed-off shotgun, running down Thomas and Wallace, and shooting them. This will support the element of sudden passion or heat of blood sufficient to deprive Willis of his self-control and cool reflection.
Moreover, Thomas was positive that Willis fired two shotgun blasts at him, struck him once, and attempted to fire a third shot at his head. Cynthia confirmed that Willis aimed the gun at Thomas and shot him; other witnesses agreed that he was holding a gun shortly after the shootings. Viewing this evidence in the light most favorable to the State, any rational trier of fact could have found, beyond a reasonable doubt, the essential elements of attempted manslaughter and that Willis was the perpetrator. These assignments of error lack merit.

Denial of continuance
By his fourth original assignment of error, Willis urges the District Court erred in denying his motion for continuance. He contends that the court should have granted a continuance "for the minimal period of one week for the sake of justice" in which his retained counsel, Mr. Stamps and Mr. Sibley, might prepare for trial. Alternatively, he suggests that the court "could have required the previous attorney, Mr. Paul Garner, to go forward with the trial," or at least granted a recess of trial.
The State filed the bill of information on June 2, 1998. The court appointed an indigent defender, Mr. Paul Garner, to represent Willis on August 11, 1998. Mr. Garner filed various motions on Willis's behalf and represented him at pretrial hearings over the next 18 months. Trial settings were fixed for September and November 1999, but upset both times. Trial was ultimately set for February 22, 2000.
When Willis's case was called, he did not appear; the court issued a bench warrant. On that date, however, Ron C. Stamps and Dale L. Sibley filed a motion to be recognized as counsel of record, together with a motion for continuance. On the afternoon of February 22, 2000, they appeared in court and requested the continuance.[1] The court denied the continuance but gave counsel until 9:30 a.m. the next day to seek a writ from this court. The following day (February 23), this court denied the writ on the showing made. That afternoon, Mr. Stamps again urged his motion for continuance; the District Court again denied it and, after a recess, began jury selection. The next day (February 24), *1080 Mr. Stamps asked the court for an oral ruling on the motion for continuance. The court did so on the morning of February 25, outlining these facts and adding that because of a family obligation, trial would not be held over the weekend of February 26-27. R.pp. 387-394.
A motion for continuance must be in writing and filed at least seven days prior to trial; in the interest of justice the court may grant a continuance filed at any time, after a contradictory hearing. La. C.Cr.P. art. 707. The grant of continuance is discretionary with the trial court. La. C.Cr.P. art. 712; State v. Strickland, 94-0025 (La.11/1/96), 683 So.2d 218. The denial of a motion for continuance is not grounds for reversal absent abuse of discretion and a showing of specific prejudice. State v. Snyder, 98-1078 (La.4/14/99), 750 So.2d 832; State v. Shaw, 27,892 (La.App. 2 Cir. 4/3/96), 672 So.2d 237. The defendant in a criminal trial may not, by a last minute change of counsel, force a postponement. State v. Leggett, 363 So.2d 434 (La.1978); State v. Anthony, 347 So.2d 483 (La.1977); State v. Williams, 00-1850 (La. App. 5 Cir. 4/11/01), 786 So.2d 785, writ denied 01-1432 (La.4/12/02), 812 So.2d 666.
In denying the continuance, the District Court noted that Mr. Stamps and Mr. Sibley had not been retained until the date set for trial, thus creating a strong inference that the move was dilatory. Relating the procedural history, the court noted that between the stay for the writ application and an emergency in the judge's family, counsel gained more than two days in which to prepare for trial by viewing the D.A.'s files. R.p. 393. On appeal, Willis does not show that any of these factual findings is wrong.
To the District Court's findings we would add that the matter had been pending for 18 months and that trial had already been continued twice. There is no explanation for the dismissal of Mr. Garner, for the delay in retaining Mssrs. Stamps and Sibley, or for why they could not have conferred with Mr. Garner, who had obtained open file discovery. Under the circumstances, the court was entitled to find that this motion for continuance, filed after the matter had been called for trial, was a dilatory tactic. Moreover, Willis has not shown any specific prejudice arising from the ruling. On this record, we simply cannot say the court abused its broad discretion in denying the continuance. State v. Anthony, supra; State v. Williams, supra. This assignment lacks merit.

Other procedural issues
By his second original assignment, Willis urges the District Court erred in failing to require the State to produce discovery to defense counsel. He concedes that in response to a motion for discovery, his original counsel, Mr. Garner, viewed the State's evidence under the district's "open file" policy, but contends that trial counsel, Mr. Stamps and Mr. Sibley, never got the opportunity to do so. Willis urges that this denied them the opportunity to locate any exculpatory evidence, denied him due process, and now mandates reversal.
On August 21, 1998, Mr. Garner filed a motion for discovery "permitting the inspection and photocopying" of material discoverable under La.C.Cr.P. arts. 716 et seq. At trial on February 25, 2000, Mr. Stamps twice conceded that Mr. Garner had inspected the State's file. R.pp. 394, 509. In short, the State complied with discovery. Even if the State somehow violated discovery rules, not every failure to disclose will warrant a reversal. State v. Rhodes, 29,207 (La.App. 2 Cir. 1/22/97), 688 So.2d 628, writ denied 97-0753 (La.9/26/97), 701 So.2d 980, and citations therein. The effects of a discovery *1081 violation may be remedied by cross examination. State v. Powell, 598 So.2d 454 (La.App. 2 Cir.), writ denied 605 So.2d 1089 (1992).
Here, defense counsel extensively cross examined each of the State's witnesses, notably Marshal Willis and Dep. Talley, and called Dep. Pugh on direct examination. Thorough interrogation of these law enforcement officers developed essentially all matters that may have been revealed by discovery. Moreover, Mr. Garner viewed the D.A.'s file but, in the 18 months that he represented Willis, he filed no motion to suppress or quash, or anything else suggesting the existence of exculpatory evidence. Finally, as noted earlier, on the afternoon of February 22, 2000, the court granted a brief stay (until 9:30 a.m. on February 23) so Mr. Stamps could apply for writs on the denial of continuance. During this time, co-counsel could have asked to view the D.A.'s file or conferred with Mr. Garner, but apparently did not do so. On this record, we detect no denial of due process and no specific prejudice. This assignment lacks merit.
By his third original assignment, Willis urges the District Court erred in failing to order the State to provide a bill of particulars, thus denying him due process and equal protection. Mr. Garner filed an application for a bill of particulars on August 21, 1998; because the State never complied, Willis contends, the indictment should be quashed. State v. Warren, 29,630 (La.App. 2 Cir. 9/24/97), 700 So.2d 1297.
The instant bill of information charged Willis with "attempt[ing] to commit second degree murder" of both victims; because of this short-form allegation, disclosure of particulars was warranted. State v. Warren, supra; State v. Glynn, 94-0332 (La.App. 1 Cir. 4/7/95), 653 So.2d 1288, writ denied 95-1153 (La.10/6/95), 661 So.2d 464. However, open file discovery relieved the State of having to answer the application for bill of particulars. State v. Phagans, 412 So.2d 580 (La.1982); State v. Glynn, supra; State v. Jones, 544 So.2d 1209 (La.App. 3 Cir.1989). As noted above, Willis concedes that Mr. Garner obtained open file discovery. Moreover, he does not allege that a bill of particulars would have provided any additional information; no prejudice is shown. This assignment of error lacks merit.

Excessive sentence
By his third, fourth and fifth supplemental assignments of error, Willis urges the District Court erred in imposing excessive sentences, in failing to articulate sufficient considerations and a factual basis for the sentences, La.C.Cr.P. art. 894.1, and in imposing consecutive sentences for offenses arising out of a single course of conduct, La.C.Cr. P. art. 883. Specifically, Willis contends that despite his significant juvenile record, he has no prior felony convictions as an adult, is the father of two children, and has "not been in any trouble during his adult life." He submits that the incident was "nothing more than a barroom brawl" in which the two victims were "not blameless; their actions played an important role in the incident." He adds that without compliance with art. 894.1, there is insufficient justification for making the sentences consecutive.
At the outset we note that Willis filed no motion to reconsider sentence in the trial court. Accordingly, he is precluded from advancing these factual contentions which were not presented below. He is simply relegated to having this court consider the bare claim of constitutional excessiveness. La.C.Cr.P. art. 881.1; State v. Mims, 619 So.2d 1059 (La.1993); State v. Stevens, 33,700 (La.App. 2 Cir. 8/23/00), 766 So.2d 634. Because, however, *1082 Willis argues that his sentences should have been concurrent, we have reviewed the District Court's reasons for judgment, rendered on April 7, 2000.
When two or more convictions arise from the same act or transaction, or constitute parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directed that some or all be served consecutively. La.C.Cr.P. art. 883. It is within the trial court's discretion to order consecutive rather than concurrent sentences. State v. Walker, 00-3200 (La.10/12/01), 799 So.2d 461; State v. McCray, 28,531 (La.App. 2 Cir. 8/21/96), 679 So.2d 543. If the court chooses consecutive sentences, it must state the factors considered and the reasons for the consecutive terms. State v. Wilson, 28,403 (La.App. 2 Cir. 8/21/96), 679 So.2d 963. Relevant factors include the defendant's criminal history, the gravity or dangerousness of the offenses, the viciousness of the crimes, the harm done to the victims, and whether the defendant poses an unusual risk of danger to the public. State v. Wilson, supra; State v. Pickett, 628 So.2d 1333 (La.App. 2 Cir.1993), writ denied 94-0348 (La.5/20/94), 637 So.2d 476.
Despite Willis's argument that he has "not been in any trouble during his adult life," the PSI disclosed (and the District Court found) that while on bail for the instant offenses, Willis was arrested for aggravated second degree battery, a charge which was later reduced to simple battery. The PSI also disclosed a "very significant" juvenile record and an unresolved charge of resisting an officer. These facts, which Willis does not dispute, undermine his claim of a crime-free adult life. The court found that the shootings displayed deliberate cruelty to the victims. This is underscored by the fact that the initial fray had subsided and Wallace was attempting to walk away from the confrontation when Willis pursued the retreating men with a sawed-off shotgun. A more senseless act of violence is difficult to imagine. The court also found that the shootings caused significant permanent injury and economic loss to both victims. The record fully supports these findings, as Thomas is crippled and Wallace lost his leg. We conclude that the District Court adequately supported the imposition of consecutive sentences under art. 883.
A sentence violates La. Const. art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Lobato, 603 So.2d 739 (La.1992). A sentence is grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Lobato, supra; State v. Hogan, 480 So.2d 288 (La. 1985). A sentence within the statutory limits will not be set aside absent a manifest abuse of the sentencing judge's discretion. State v. Lobato, supra; State v. Square, 433 So.2d 104 (La.1983).
The maximum penalty for attempted manslaughter is 20 years at hard labor. La. R.S. 14:31 B, 14:27. The maximum penalty for aggravated battery is ten years at hard labor. La. R.S. 14:34. The instant sentences of 15 and seven years respectively are in the upper half of the sentencing range but are warranted in light of the utter senselessness of the crimes and the serious injuries inflicted. They neither shock our sense of justice nor appear disproportionate to sentences for other similar offenses. See, e.g., State v. Dubroc, 99-730 (La.App. 3 Cir. 12/15/99), 755 So.2d 297; State v. Boyd, 95-1248 (La.App. 4 Cir. 8/28/96), 681 So.2d 396. These assignments of error lack merit.

*1083 Sentencing delay

By his sixth supplemental assignment of error, Willis urges the District Court erred in sentencing him immediately after denying his motion for new trial. He contends that the court's failure to observe the 24-hour sentencing delay of La.C.Cr.P. art. 873 mandates a remand for resentencing. In support he cites State v. Williams, 96-37 (La.App. 3 Cir. 6/26/96), 677 So.2d 692.
If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least 24 hours after the motion is overruled. La.C.Cr.P. art. 873. A sentence imposed without the requisite delay is deemed "premature and therefore void." State v. Augustine, 555 So.2d 1331 (La. 1990), citing State v. Mistich, 186 La. 174, 171 So. 841 (1937). The phraseology of certain opinions may suggest that art. 873 is a bright-line rule, any violation of which requires a remand. State v. Williams, supra; State v. Brown, 01-41 (La.App. 5 Cir. 5/30/01), 788 So.2d 694. However, when there is a substantial lapse of time between the defendant's trial and the imposition of sentence, a technical violation of art. 783 does not require remand absent some other showing of prejudice. State v. White, 404 So.2d 1202 (La.1981); State v. Keleman, 444 So.2d 1328 (La.App. 2 Cir.), writ denied 447 So.2d 1069 (1984); State v. Colvin, 452 So.2d 1214 (La.App. 2 Cir.), writ denied 457 So.2d 1199 (1984).
The jury returned Willis's guilty verdicts on February 28, 2000. The District Court originally imposed sentence on April 7, 2000, but this court vacated the sentences and remanded for a ruling on the motion for new trial. The District Court denied the motion for new trial and imposed sentences at the same hearing on November 6, 2001. Simply put, after the review of a PSI and over 20 months' delay, the District Court imposed the same sentences it had previously announced. We do not find anything "premature" in this procedure. Moreover, Willis does not contend that he was prejudiced in any way. Under the circumstances, the District Court's failure to observe art. 873 was harmless error. This assignment lacks merit.

Ineffective assistance of counsel
By his first original assignment of error, Willis urges that the performance of retained counsel, Mr. Stamps and Mr. Sibley, constituted ineffective assistance of counsel and deprived him of a fair trial. He contends these counsel were ineffective because they (1) failed to obtain a continuance on the first day of trial and in subsequent oral motions to the court; (2) failed to obtain "open file" discovery which had been provided to appointed counsel, Mr. Garner; and (3) failed to move for a change of venue, even though it transpired at voir dire that many prospective jurors knew the defendant, defense attorneys and prosecutor. He concludes that retained counsel were unprepared and could only "shoot from the hip," despite the fact that they were reasonably effective in defending him.
As a general rule, a claim of ineffective assistance of counsel is more properly raised by application for post conviction relief in the trial court, where a full evidentiary hearing may be conducted under La.C.Cr.P. art. 930. State ex rel. Bailey v. City of West Monroe, 418 So.2d 570 (La.1982); State v. Hunt, 34,945 (La. App. 2 Cir. 9/26/01), 797 So.2d 138. When the record is sufficient, the appellate court may nonetheless resolve the question on direct appeal in the interest of judicial *1084 economy. State v. Ratcliff, 416 So.2d 528 (La.1982); State v. Hunt, supra.
A claim of ineffectiveness of counsel is analyzed under the two-prong test developed by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish that his attorney was ineffective, the defendant must show (1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced his defense. To establish the deficiency prong of the test, the defendant must show that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Constitution. To establish prejudice, defendant must show that, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the trial would have been different. Strickland v. Washington, supra; State v. Pratt, 26,862 (La.App. 2 Cir. 4/5/95), 653 So.2d 174, writ denied 95-1398 (La.11/3/95), 662 So.2d 9. A reviewing court gives great deference to trial counsel's judgment, tactical decisions and trial strategy, strongly presuming that he has exercised reasonable professional judgment. State v. Hunt, supra.
For the reasons already discussed, we find no reversible error in the District Court's rulings on the motions for continuance and discovery. Counsel made detailed and incisive arguments on these issues; just because they failed to persuade the court to exercise its discretion differently does not mean that counsel's conduct was deficient. Even though they never obtained "open file" review of the State's case, counsel vigorously and effectively cross examined each of the State's witnesses, especially Thomas Ridley, exposing many inconsistencies in his testimony. Taken as a whole, this record falls far short of showing that counsel failed to function as the "counsel" guaranteed by the Sixth Amendment. State v. Pratt, supra.
As for prejudice, Willis asserts in conclusory tones that counsel failed to litigate the case "properly, aggressively, or competently because they were not prepared to try the case." Even so, he concedes that his counsel's trial strategy was "reasonably effective" in that it resulted in verdicts (attempted manslaughter and aggravated battery) much less than the offenses charged (two counts of second degree murder). At this late date, appellate counsel has not alleged that there really was any exculpatory material which trial counsel failed to uncover and would have altered the outcome. In fact, he alleges nothing more than hypothetical injury from counsel's trial conduct. This will not suffice to show prejudice. State v. Hunt, supra. Any matters not on the record are relegated to a claim for post conviction relief. On the instant record, the assignment lacks merit.

Conclusion
By his fifth original assignment of error, Willis asks this court to review the entire record for error patent. We have done so in accord with La.C.Cr.P. art. 920(2) and State v. Oliveaux, 312 So.2d 337 (La.1975), but found nothing we consider to be error patent. For the reasons expressed, the convictions and sentences are affirmed.
CONVICTIONS AND SENTENCES AFFIRMED.
NOTES
[1] The court twice stated that Mr. Stamps was present that morning but told her Willis had not yet retained him at the time. The court also stated that Mr. Stamps said he would not file a motion for continuance unless he was retained as counsel. R.p. 162.